VINCE S. HAN AND KATHY K. HAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Han v. Commissioner
Docket No. 9135-90
United States Tax Court
T.C. Memo 1993-386; 1993 Tax Ct. Memo LEXIS 391; 66 T.C.M. (CCH) 499; August 24, 1993, Filed *391 Respondent examined petitioners' 1986, 1987, and 1988 Federal income tax returns and determined tax deficiencies and additions to tax aggregating $ 587,768 (without consideration of additions to tax for fraud under sec. 6653(b)(1)(B)). Respondent issued petitioners a notice of deficiency before issuing petitioners a preliminary notice of deficiency (i.e., a 30-day letter). Approximately 26 months after petitioners filed a petition in this Court for a redetermination of their Federal income tax liability, respondent's Appeals Office conceded fully the tax deficiencies and additions to tax asserted in the notice of deficiency. Petitioners filed a motion for award of reasonable litigation and administrative costs under sec. 7430 and Rule 231. In connection therewith, the Court scheduled a hearing and set the procedures for discovery. Respondent failed to comply fully with petitioners' discovery requests. 1. Held, the Court will grant one of two motions by petitioners for sanctions against respondent for noncompliance with petitioners' discovery requests. 2. Held further, petitioners exhausted the administrative remedies available to them within the Internal *392 Revenue Service. Minahan v. Commissioner, 88 T.C. 492 (1987), followed. 3. Held further, respondent's positions in the administrative proceeding and the proceeding in this Court were not substantially justified. Huffman v. Commissioner, 978 F.2d 1139 (9th Cir. 1992), affg. in part, revg. in part on other grounds, and remanding T.C. Memo. 1991-144, followed. 4. Held further, the litigation and administrative costs claimed by petitioners are reasonable, with slight modifications. For petitioners: Mark A. Oates, James M. O'Brien, and Fred D'Amato. For respondent: James F. Kidd and Jonathan DeCator. LARO
LARO
MEMORANDUM FINDINGS OF FACT AND OPINION LARO, Judge: Petitioners filed a motion with this Court for award of reasonable litigation and administrative costs (Motion), and subsequently filed a supplemental motion for award of reasonable litigation costs (Supplemental Motion), under section 7430 and Rule 231. Hereinafter, Vince S. Han and Kathy K. Han are collectively referred to as petitioners and are separately referred to as Han and Mrs. Han, respectively. *393 Petitioners seek an award totaling $ 51,152.60. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Respondent previously determined that petitioners were liable for deficiencies in, and additions to, their Federal income taxes as follows: Additions to Tax Sec. Sec. Sec. Year
Deficiency
6653(b)(1)(A)
6653(b)(1)(B)
6661 1986
$ 83,587
$ 62,690
$ 20,896.75
1987
22,898
17,174
[1]
5,724.50
Additions to Tax Year
Deficiency
Sec. 6653(b)
Sec. 6661
1988
$ 187,399
$ 140,549
$ 46,849.75
These amounts were set forth in respondent's notice of deficiency issued to petitioners on February 14, 1990. On May 9, 1990, petitioners filed a petition in this Court for a redetermination of respondent's determinations set forth in her notice of deficiency. Prior to trial, on July 2, 1992, petitioners and respondent filed with the Court a stipulation of settlement in which they agreed there *394 were no deficiencies or additions to tax for petitioners' 1986, 1987, and 1988 taxable years. Petitioners filed their Motion contemporaneously with our filing of this stipulation. On March 5 and 6, 1993, the Court held a hearing on petitioners' Motion. Subsequently, petitioners filed their Supplemental Motion requesting litigation costs incurred by petitioners in connection with the hearing. With respect to petitioners' Motion and Supplemental Motion, we must decide: (1) Whether the Court should grant petitioners' two motions for sanctions against respondent for noncompliance with petitioners' discovery requests in preparation for the hearing. We will grant one of these motions and deny the other. (2) Whether petitioners exhausted the administrative remedies available to them within the Internal Revenue Service (Service). We conclude they did. (3) Whether respondent's position contained in her notice of deficiency, answer, and amended answer was substantially justified in both fact and law. [1] We conclude it was not. *395 (4) Whether the litigation and administrative costs claimed in petitioners' Motion and Supplemental Motion were reasonable. We conclude they were, with slight modifications; we award petitioners administrative costs of $ 1,997.04 and litigation costs of $ 44,372.31. In making our decisions, we take into account the hearing record, petitioners' Motion and Supplemental Motion, respondent's objections to petitioners' Motion and Supplemental Motion, petitioners' response to respondent's objection to petitioners' Motion, respondent's reply to petitioners' response to respondent's objection to petitioners' Motion, and the briefs, affidavits, and memoranda of law provided by both parties. FINDINGS OF FACT 1. General
Some of the facts have been stipulated and are so found. The stipulations and accompanying exhibits are incorporated herein by this reference. Han and Mrs. Han are husband and wife. At the time they filed their petition, they resided in Glenview, Illinois. 2. Han's Business
In or about 1980, Han and Charles Lee (Lee) started a partnership to sell in the United States antique reproduction clocks made in Korea. The clocks primarily were made by two manufacturers, *396 Daijin Enterprises Co., Ltd. (Daijin) and Dong Bang Enterprise Co., Ltd. (Dong Bang). Initially, customers included small retail stores. Han and Lee expanded their business by selling clocks at trade shows; at these shows, Han met representatives from large corporations such as American Express. In 1984, the partnership was incorporated under the name Clocks, Ltd. (Clocks) and Clocks elected to be treated as an S corporation effective with the 1984 taxable year. In 1985, Han bought Lee's interest in Clocks. During 1986 through 1988, the taxable years at issue, Han was the sole shareholder of Clocks; Clocks imported antique reproduction clocks for sale in the United States. Clocks initially sold these clocks to its retail customers in small lots (e.g., five clocks at a time), and Han was able to finance purchases from Korea on an open credit basis. American Express later became a customer of Clocks, and Clocks' sales substantially grew; this changed the way Han conducted the business. [2] Due to the growth of Clocks, Han obtained financing abroad and at least a $ 1/2 million line of credit to accommodate the American Express orders. Han's brother, Chang Soo Han (Chang Soo), *397 assisted Han in raising cash for Clocks by collateralizing his property for an overseas loan. Han's clock business ultimately failed. Daijin and Dong Bang sold Clocks a large number of defective clocks. In turn, Clocks sold these clocks to its customers, including American Express, who sold these clocks to their customers. Many of these clocks eventually were returned to Clocks and Clocks was required to credit American Express approximately $ 100,000. Clocks filed claims against Daijin and Dong Bang, but Daijin and Dong Bang generally did not pay the claims; the representative of each company told Han to "give us more orders; I will give you a discount." In the latter part of 1986, American Express ceased buying clocks from Clocks. Clocks continued selling clocks to *398 its smaller customers, and Clocks continued incurring business debts and borrowing against its line of credit. When Clocks was unable to pay its debts, the creditors threatened to foreclose on the collateralized property of Chang Soo. The creditors never forgave these debts; they took action against Chang Soo. Chang Soo borrowed about $ 200,000 to pay the collateralized debt, and petitioners later mortgaged their home to raise more funds to pay Clocks' creditors. Chang Soo never forgave any debt owed to him by Clocks. 3. Recordkeeping for Petitioners and Clocks
Han kept the books and payment stubs for Clocks. Han's certified public accountant, Yong S. Kim (Accountant), checked the books and payment stubs monthly. Han kept Clocks' records separate from his personal records and was careful to keep his business expenses apart from his personal expenses. Accountant established for Clocks an accounting system for recording expenses paid by check; these records were inspected by Accountant during his monthly reviews. At "tax time", Han prepared and delivered to Accountant a workpaper that included: (1) Financial information for Clocks (e.g., gross receipts, expenses, purchases, *399 inventory, accounts payable) and (2) financial information for petitioners' personal return. Accountant prepared Clocks' corporate income tax return and petitioners' personal income tax return for each year at issue, and mailed these returns to Han and Mrs. Han for signatures. [3] Han signed his personal returns, as did Mrs. Han, and signed Clocks' 1987 and 1988 corporate returns in his capacity as its president. 4. Petitioners' Key Contacts With the Examination Division
a. Meeting on April 18, 1989
In 1989, respondent commenced examinations (audits) of the Federal income tax returns of petitioners and Clocks. In connection therewith, on April 18, 1989, one of respondent's revenue agents (Revenue Agent) met with Han and Accountant at Accountant's office. Revenue Agent, a revenue agent since 1987, was assigned these cases in or about February 1989 as two *400 of his training cases. Revenue Agent was responsible for developing the facts and law of the cases. Revenue Agent recently had completed partnership and S corporation training. When he received these cases, Revenue Agent had approximately 1-1/2 years of auditing experience with the Service and had completed only about 30 audits. None of these 30 audits involved S corporations and none of them involved fraud. Revenue Agent's audits of Clocks and petitioners were Revenue Agent's first "unagreed cases". During the meeting with Revenue Agent, Han was calm and composed. Revenue Agent asked questions of Han and Accountant; Han and Accountant answered Revenue Agent's questions and were responsive to them. Among other things, Han explained to Revenue Agent that Clocks failed. b. Meeting on August 17, 1989
On August 17, 1989, Han met with three of respondent's agents in the basement of his home; the agents asked to meet at Han's home. At this meeting, Han gave Revenue Agent records relating to: (1) His personal disbursements, (2) his personal bank accounts, (3) his personal cancelled checks, (4) his house payments, (5) Clocks' current financial statement and analysis of certain *401 debts, (6) Clocks' line of credit, (7) Clocks' forgiveness of indebtedness, and (8) Clocks' cancelled checks, bank accounts, tax returns, and travel and entertainment account. Revenue Agent requested these documents at the prior meeting on April 18, 1989. Han did not refuse to give Revenue Agent any documents requested by him. Revenue Agent did not look at all the documents that Han gave him at this meeting. Revenue Agent and a second revenue agent (Assistant Revenue Agent) arrived at Han's home first. Respondent's supervising agent (Supervising Agent) arrived about 25 minutes later. Supervising Agent was a tall man, in relation to Han and Mrs. Han, and wore sunglasses. Before Supervising Agent arrived, the meeting was very cordial and businesslike; Revenue Agent and Assistant Revenue Agent asked questions and Han answered them. After Supervising Agent arrived, the atmosphere in the room quickly changed. Supervising Agent objected to questions asked by Revenue Agent or Assistant Revenue Agent, talked in a loud voice, and approximately 5 minutes after arriving at the meeting, stood up and pointed a finger at Han demanding from him "You have to pay $ 70,000 now; if you don't *402 pay, you are going to go to jail. * * * I will put you in jail". Supervising Agent also loudly stated "If you don't pay $ 70,000 now, you are going to pay a whole lot more", and mentioned a number in excess of $ 345,000. Supervising Agent's tirade lasted about 15 to 20 minutes, after which the three agents left; Supervising Agent gave Han 1 week to pay $ 70,000. c. Subsequent Meeting at Accountant's Office
Approximately 1 week later, Han received a call from Accountant. Supervising Agent was with Accountant in Accountant's office, loudly demanding that Han pay $ 70,000. In the alternative, Supervising Agent loudly stated, the Service would seize Han's home through a jeopardy assessment. Supervising Agent demanded that Han pay now and refused Han's request to consult an attorney. Han did not pay the $ 70,000 and sought legal advice. d. Meeting on November 14, 1989
On November 14, 1989, Supervising Agent, Revenue Agent, and Assistant Revenue Agent met with James M. O'Brien (O'Brien) and Mark A. Oates (Oates). Both O'Brien and Oates were attorneys at Baker & McKenzie and were recently retained by petitioners to represent them in the audit (hereinafter, O'Brien and *403 Oates collectively are referred to as petitioners' counsel). At the beginning of the meeting, Supervising Agent informed petitioners' counsel that the meeting was petitioners' final conference with respect to the taxable years in issue. Revenue Agent presented O'Brien with Forms 872 -- Consent to Extend Time to Assess Tax -- to extend until April 30, 1991, the period of limitations for the years under examination for both petitioners and Clocks. [4] Revenue Agent informed petitioners' counsel that petitioners had to consent to extend the period of limitations if they wanted to go to respondent's Office of Appeals (Appeals) before a notice of deficiency was issued to them. Revenue Agent made two proposals under which petitioners could settle the cases; under the most favorable proposal to petitioners, they had to pay *404 a tax deficiency of $ 178,388, additions to tax (for civil fraud and substantial understatement) of $ 178,388, and statutory interest. Supervisory Agent informed petitioners' counsel that respondent would issue a notice of deficiency if respondent did not hear from petitioners within 7 days. Supervising Agent refused a request by petitioners' counsel to extend this 7-day period to at least 3 weeks to allow petitioners' counsel to familiarize themselves with the facts of petitioners' case. [5]
With respect to the proposals for settlement, respondent would not "nitpick" over the figures and, as stated by Supervising Agent, "This is it, take it or leave it." The meeting concluded with Supervising Agent threatening to begin the process for a jeopardy assessment if petitioners did not agree with the proposals. Following the meeting, Revenue Agent was pressured *405 to close the cases because he was nearing his deadline. e. Telephone Conversation on November 20, 1989
On November 20, 1989, petitioners' counsel telephoned Revenue Agent to inform him that petitioners had rejected the proposals made at the meeting on November 14, 1989. In response, Revenue Agent offered to settle the cases if petitioners paid a tax deficiency of $ 103,197, additions to tax (for civil fraud and substantial understatement) of $ 103,197, and statutory interest. Petitioners rejected this offer from Revenue Agent and did not consent to extend the period of limitations. Because petitioners did not consent to extend the period of limitations, Revenue Agent did not perform thoroughly his examinations of the returns of petitioners and Clocks. 5. Issues Raised by Revenue Agent During the Examinations
a. Overview
On December 28, 1989, Revenue Agent prepared revenue agent reports (RAR's) for his separate examinations of Clocks and petitioners. Revenue Agent's RAR for Clocks reflected his adjustments to the income of Clocks as follows: 1986 1987 1988 Ordinary income
$  50,480
Travel and entertainment (T&E)
2,442
$   935
Insurance expense
1,032
Interest expense
1,305
Forgiveness of debt
12,139
370,958
Cost of goods sold
$ 188,699
171,259
19,025
*406 Revenue Agent's RAR for petitioners reflected his adjustments to the taxable income of petitioners as follows: [6]
1986
1987
1988
Ordinary income -- Clocks
$  50,480 T&E -- Clocks
2,442
$  935 Insurance expense -- Clocks
1,032 Interest expense -- Clocks
1,305 Forgiveness of debt -- Clocks
12,139 370,958 Cost of goods sold -- Clocks
$ 188,699 171,259 19,025 Capital gains and losses
84,730 95,140 478,939 Itemized deductions
(38,397)
(36,731)
(25,344)
Based on these adjustments to petitioners' taxable income, Revenue Agent's RAR for petitioners also reflected: (1) A $ 283 increase in a general business credit for 1986; (2) an increase in self-employment taxes due from them for the 1986, 1987, and 1988 taxable years by $ 5,166, $ 5,387, and $ 5,859, respectively; and (3) the additions to tax for fraud and substantial understatement of tax mentioned *407 above. [7]
The issues underlying the adjustments contained in these RAR's generally were as follows: (1) Whether Chang Soo, Dong Bang, and/or Daijin forgave amounts owed to them by Clocks; (2) With respect to Clocks' cost of goods sold, whether the all events test under section 461 was met with respect to the purchases of clocks from Daijin and Dong Bang; (3) What Han's basis in the stock of Clocks was; and (4) Whether the additions to tax for fraud were appropriate. b. Forgiveness of Indebtedness
Revenue Agent attributed income to Clocks from forgiveness of indebtedness on cancellation of accounts payable. *408 As stated in Revenue Agent's RAR for Clocks, "Examination of the outstanding liabilities clearly shows that there was no legal action or request for credit collection by the creditors made against * * * [Clocks] or its sole shareholder Vince Han." In this regard, Revenue Agent primarily relied on purported statements from Han that he was not going to repay the debts. Revenue Agent never took any bona fide steps to determine whether Chang Soo, Dong Bang, or Daijin forgave any debt. Revenue Agent never contacted Chang Soo, Dong Bang, or Daijin, and neither Chang Soo, Dong Bang, nor Daijin communicated to Revenue Agent that any debt was forgiven. Revenue Agent did not research applicable sections of the Internal Revenue Code to determine any impact on his adjustments. As stated by Robert Dedera (Appeals Officer), respondent's seasoned Appeals Officer, who was assigned the cases when they eventually were transferred to Appeals, [8] "I could see no basis for * * * [Revenue Agent] concluding that there was a forgiveness of indebtedness." *409 c. Cost of Goods Sold
Revenue Agent disallowed costs of goods sold claimed on Clocks' Federal income tax returns; Revenue Agent did not believe that the all events test under section 461 had been met with respect to the purchases of clocks from Daijin and Dong Bang. Revenue Agent alleged that the liabilities were not fixed because: (1) Dong Bang and Chang Soo paid for some of the purchases, and (2) Han did not intend to pay the accounts payable of Clocks. Revenue Agent knew about the defective clocks that Clocks purchased from Daijin and Dong Bang. Revenue Agent also knew that, with respect to Clocks' accounts payable "paid" by Chang Soo, Chang Soo wanted to be repaid and was telephoning Han night and day asking for payment. Han gave Revenue Agent many invoices to Clocks from Daijin and Dong Bang; these invoices reflected the number of clocks purchased and their unit prices. Han also gave Revenue Agent contracts entered into with respect to the invoices. Revenue Agent did not attempt to determine whether or not clocks were shipped pursuant to the contracts and invoices and had no evidence showing that Daijin and Dong Bang did not ship the clocks to Clocks. Revenue Agent *410 also had no evidence that the amount of the liability was not fixed and determinable at the time the clocks were shipped. As stated by Appeals Officer, "I do not believe [Revenue Agent] applied [section 461] correctly in this situation * * * I could not support the position taken by [Revenue Agent] with regard to the [accounts payable] * * *. There was not a reasonable basis" in law for the adjustment. Revenue Agent disallowed the cost of goods sold while at the same time finding that accounts payable were forgiven. By simultaneously applying both positions, Revenue Agent substantially overstated the tax in controversy. This, according to Appeals Officer, "was troubling to me". [9]
d. Han's Basis in the Stock of Clocks
Revenue Agent treated certain distributions from Clocks to Han as taxable distributions *411 because he believed that the distributions were in excess of Han's basis in Clocks. In Revenue Agent's RAR for Clocks, Revenue Agent assigned to Han a zero basis in the stock of Clocks for the 1986 and 1987 taxable years and assigned a basis of $ 20,367 for the 1988 taxable year. [10]
Revenue Agent prepared minimal audit papers to justify or support the basis in Clocks that he assigned to Han. The record developed by Revenue Agent with respect to Han's basis was incomplete, and the audit papers that he prepared were incorrectly calculated. Revenue Agent did not perform a basis analysis. Appeals Officer testified that a basis analysis should be performed during the audit of a flow-through entity such as Clocks. e. Applicability *412 of the Addition to Tax for Fraud
Revenue Agent's RAR for petitioners states "Examination of [petitioners' 1986, 1987, and 1988] 1040 returns [was] performed, and badges of fraud were identified in all three years." [11] Revenue Agent had no documentary evidence that suggested fraud by petitioners and did not perform an analysis of Han's basis in Clocks before including the additions to tax for fraud in the RAR. Revenue Agent recommended the additions to tax for fraud because, based on his review of the facts of petitioners' case, Han "was not an honest taxpayer". As concluded by Appeals Officer after reviewing the administrative file, it was unreasonable, both as a matter of fact and law, for Revenue Agent to assert fraud in this case. *413 f. Synopsis of Revenue Agent's Four Positions
Revenue Agent's position on all four issues is best summarized by the following testimony of Appeals Officer: [Oates]: I am asking, based on what you knew, what you have seen, what you have analyzed, and what you have testified here today, what do you think about [Revenue Agent's adjustments]? [Appeals Officer]: We could not sustain any of these positions based upon the facts that we had.
6. Transfer of Cases by District Directors to Appeals
During the years in which petitioners were under examination, 5 Administration, Internal Revenue Manual (CCH), section 8232.1 at 25,557 [12] *414 provided rules for the transfer of cases from District Directors to Appeals; a case with fewer than 120 days remaining until the expiration of the period of limitations theoretically could be, but ordinarily was not, transferred to Appeals. Robert Neurater (Assistant Chief) was the assistant chief of Appeals in Chicago. [13] In 30 years of employment with the Service, Assistant Chief never saw or heard of a case being transferred to Appeals with fewer than 120 days remaining until the expiration of the period of limitations. [14]
7. Petitioners' Key Contacts With Appeals
a. Meeting on April 9, 1991
On April 9, 1991, Appeals Officer first met with Oates in connection with petitioners' case. b. Letter to Oates on April 10, 1991
On April 10, 1991, Appeals Officer mailed a letter to Oates enclosing Revenue Agent's RAR's for petitioners and Clocks. This was the first time that petitioners or their counsel received Revenue Agent's RAR's. c. Meeting on October 4, 1991
On October 4, 1991, Appeals Officer met with Oates. At this time, it was "very clear" to Appeals Officer that Clocks properly accrued its accounts payable to Daijin and *415 Dong Bang under section 461. [15]
d. Letter to Appeals Officer on February 5, 1992
On February 5, 1992, Oates mailed a letter to Appeals Officer enclosing an accounting firm's calculation of Han's basis in Clocks. Revenue Agent had, or could easily have obtained, all the information necessary to prepare this basis calculation. 8. Requested Litigation and Administrative Costs
The litigation and administrative expenses incurred *416 by petitioners in connection with this matter were as follows: ADMINISTRATIVE COSTS
SERVICES FROM FEBRUARY 14, 1990 TO MAY 9, 1990
Attorney Fees
(25 hours at $ 75/hr.)
$ 1,875.00
Miscellaneous Costs
122.04
$ 1,997.04
LITIGATION COSTS
SERVICES FROM MAY 9, 1990 TO JUNE 26, 1992
Attorney Fees
(119.5 hours at $ 75/hr.)
$ 8,962.50
Law Clerks
(212.9 hours at 30/hr.)
6,387.00
Paralegals
( 76.5 hours at 30/hr.)
2,295.00
Accounting Experts
( 60.0 hours at 75/hr.)
4,500.00
(131.0 hours at 30/hr.)
3,930.00
Miscellaneous Costs
4,809.90
30,884.40
SERVICES FROM FEBRUARY 1993 TO JUNE 1993
Attorney Fees
(242.4 hours at $ [1] /hr.)
$ 29,475.61
Law Clerks
(18.6 hours at 50/hr.)
930.00
Paralegal
(24.0 hours at 85/hr.)
2,040.00
Accounting Fee
(5.0 hours at 250/hr.)
1,250.00
Miscellaneous Costs
5,758.87
$ 39,454.48 Less: Litigation and
Administrative Fees for
Services from February
14, 1990 to
June 26, 1992 Waived by
the Attorneys
and the Accountants
(21,183.32)
$ 51,152.60 *417 Respondent did not object to the calculation of the COLA rates that petitioners used to calculate the attorney fees claimed in their Supplemental Motion. [16]
*418 9. Petitioners' Discovery Requests
On February 1, 1993, this Court issued an order setting March 5, 1993, as a date certain for the commencement of the hearing on petitioners' Motion and setting the procedures for discovery. In relevant part, our order stated: "petitioners on or before February 3, 1993, may serve on respondent written requests for interrogatories, production of documents, and admissions * * * [and] respondent shall on or before February 22, 1993, respond to petitioners' above requests." On February 3, 1993, petitioners served on respondent petitioners' interrogatories and requests for admission and production of documents. On February 22, 1993, this Court received respondent's motion to extend until February 24, 1993, the time in which to respond to petitioners' interrogatories and requests; [17] we granted this motion shortly thereafter. On February 24, 1993, respondent served petitioners with her responses. *419 On March 2, 1993, petitioners filed with this Court: (1) Motions to compel answers to interrogatories and production of documents and (2) a motion under Rule 90(e) to determine the sufficiency of respondent's answers and objections to petitioners' request for admissions. [18] *420 On March 3, 1993, this Court denied petitioners' motions with respect to the interrogatories and requests for admission. However, we partially granted petitioners' request to compel production of documents, ordering respondent to "make available to petitioners all the documents in the administrative file, other than a memorandum from District Counsel dated February 9, 1990, and an appeals transmittal memorandum and supporting statement dated August 13, 1992, [19] and * * * allow petitioners to copy [these] documents." During the hearing, petitioners moved the Court to sanction respondent for her failure to deliver to petitioners information document requests (IDR's) and appointment letters allegedly contained in respondent's administrative file. [20] We granted petitioners' motion, in part, and ordered respondent not to solicit any direct testimony relating to the IDR's. Shortly thereafter, respondent's District Counsel stated to the Court "Your Honor * * *, we honestly don't know whether we have any retained copies of IDR's in the administrative file." *421 Relying on the District Counsel's assertion, the Court announced that it would allow respondent to solicit testimony from Revenue Agent about the IDR's and was taking under advisement petitioners' continual motions for sanctions with respect to both the IDR's and the appointment letters. Thereafter, respondent's District Counsel determined that the administrative file contained IDR's and stated: "I apologize to the Court, there was a misunderstanding. And I will apologize to petitioners. We didn't mean to withhold any documents". OPINION 1. Motion for Litigation and Administrative Costs: Overview
Petitioners have framed this case partly as one of abusive tactics and overreaching by respondent's agents, Revenue Agent, Assistant Revenue Agent, and Supervising Agent, who bullied and verbally assaulted petitioners. The facts support petitioners' contention; the facts present a textbook example of how respondent should not conduct an examination. With such situations in mind, Congress enacted section 7430 [21] *423 and empowered this Court to award reasonable litigation and administrative costs to certain taxpayers who prevail in this tribunal. See generally H. Rept. 97-404, *422 at 11 (1981) ("Fee awards in * * * [cases that meet the requirements of section 7430] will deter abusive actions or overreaching by the Internal Revenue Service and will enable individual taxpayers to vindicate their rights regardless of their economic circumstances"). Before December 31, 1989, section 7430 was this Court's exclusive means for awarding litigation and administrative costs to a taxpayer. [22]Whitesell v. Commissioner, 90 T.C. 702, 705 (1988). In order for this Court to award reasonable litigation and administrative costs under section 7430, an individual taxpayer must meet seven requirements. The taxpayer must: (1) File a timely motion for an award of reasonable litigation and administrative costs. Rule 231(a). Petitioners filed timely such a motion, and met this requirement. (2) Substantially prevail in the administrative proceeding and the proceeding in this Court. Sec. 7430(c)(4)(A)(ii). Respondent conceded that petitioners substantially prevailed in the administrative proceeding and the proceeding in this Court. (3) Establish that he or she did not unreasonably protract the administrative proceeding or the proceeding in this Court. Sec. 7430(b)(4). *424 Respondent originally conceded that petitioners did not unreasonably protract proceedings in this Court or at the administrative level. Following the hearing, respondent changed her tune; respondent alleged that petitioners' attorneys were needlessly argumentative in preparation for and throughout the hearing and this protracted the proceedings. We disagree. Although respondent is looking through the wider end of a telescope towards the narrower end and seeing the style of petitioners and their attorneys as argumentative and aggressive, we look through the narrower end towards the wider end, as one commonly does, and view this style as strong and adept advocacy skills. With respect to this requirement, we conclude that this style characterized by respondent as argumentative did not unreasonably protract the proceedings in this Court and hold that petitioners met this requirement. (4) Establish that respondent's positions in the administrative proceeding and the proceeding in this Court were not substantially justified in law or in fact. Sec. 7430(c)(4)(A)(i), (c)(7)(A) and (B); Pierce v. Underwood, 487 U.S. 552, 564-565 (1988); Huffman v. Commissioner, 978 F.2d 1139, 1143-1147 (9th Cir. 1992), *425 affg. in part, revg. in part on other grounds, and remanding T.C. Memo. 1991-144; Powers v. Commissioner, 100 T.C.    ,     (1993). As discussed below, we hold that petitioners met this requirement. (5) Exhaust any administrative remedies available to him or her in the Service. [23] Sec. 7430(b)(1). As discussed below, we hold that petitioners met this requirement. (6) Have a net worth that did not exceed $ 2 million at the time the petition was filed in the case. Sec. 7430(c)(4)(A)(iii); 28 U.S.C. sec. 2412(d)(2)(B) (1988). Respondent conceded that petitioners met this requirement. (7) Establish that the amount of costs claimed is reasonable. Sec. 7430(a), (c)(1) and (2). Respondent conceded that the $ 11,698.12 amount requested by petitioners in their Motion was reasonable. With respect to the $ 39,454.48 amount requested *426 in petitioners' Supplemental Motion, respondent contended that these costs were excessive. As discussed below, we hold that these costs were reasonable, with slight modifications. These seven requirements are in the conjunctive; each requirement must be met before this Court may order an award of litigation and administrative costs to a taxpayer under section 7430. Minahan v. Commissioner, 88 T.C. 492, 497 (1987). Petitioners have the burden of proof with respect to each and every requirement. Rule 232(e); Welch v. Helvering, 290 U.S. 111, 115 (1933); Gantner v. Commissioner, 92 T.C. 192, 197 (1989), affd. 905 F.2d 241 (8th Cir. 1990). An award of reasonable litigation and administrative costs to a taxpayer in a Tax Court proceeding is discretionary with the Court hearing the case; appellate courts apply an abuse of discretion standard to review our determinations of the amount of costs, if any, awarded to a taxpayer and whether respondent's positions were or were not substantially justified. Creske v. Commissioner, 946 F.2d 43, 45 (7th Cir. 1991), *427 affg. T.C. Memo. 1990-318 ("Our review of the Tax Court's decision under § 7430 is deferential"); Creske v. Commissioner, 896 F.2d 250, 252 (7th Cir. 1990), vacating and remanding T.C. Memo. 1988-574 ("standard of review applied to section 7430 cases is 'abuse of discretion'"); Powers v. Commissioner, supra at    , and the cases cited therein; see also H. Rept. 97-404, at 12 (1981). 2. Petitioners' Motion for Sanctions
Title VII of the Tax Court Rules of Practice and Procedure generally prescribes the rules for discovery in this Court, including the methods for discovery and the limitations on discovery. Included in the methods of discovery available under Title VII are written interrogatories, see Rule 71, and production of documents, see Rule 72. [24]
*428 In general, a party in a Tax Court proceeding is allowed to discover from the other party any nonprivileged information concerning the proceeding that is relevant to the subject matter of the case. It is incumbent upon the party upon whom discovery is served to furnish the requested information (or document) if: (1) It is relevant to the subject matter of the case, or (2) it is not relevant to the subject matter of the case, but reasonably calculated to lead to the discovery of relevant evidence. Rule 70(b); Zaentz v. Commissioner, 73 T.C. 469, 471-472 (1979); Branerton Corp. v. Commissioner, 64 T.C. 191, 194 (1975). The basic purposes of discovery in this Court are to ascertain facts which have a bearing on the issues before the Court and minimize surprise by allowing the parties to obtain knowledge of all relevant facts. Ash v. Commissioner, 96 T.C. 459, 463 (1991); P. T. & L. Construction Co. v. Commissioner, 63 T.C. 404, 414 (1974). In preparation for their hearing, and in accordance with our order issued on February 1, 1993, petitioners served *429 on respondent petitioners' request for production of documents. Respondent answered petitioners' request 21 days later, which included a 2-day extension granted by this Court to allow respondent to respond fully to petitioners' discovery requests and narrow the issues to be tried by this Court. Petitioners were not satisfied with respondent's response and, pursuant to Rule 104(b), appropriately filed with this Court a motion to compel production of documents. We partially granted this motion by ordering respondent to "make available to petitioners all the documents in the administrative file", other than a memorandum from District Counsel and an appeals transmittal memorandum and supporting statement. At the hearing, Revenue Agent referred to IDR's and appointment letters; petitioners moved for sanctions with respect to any IDR's and appointment letters that were in the administrative file and which respondent failed to deliver to them pursuant to their request for production of documents and this Court's order. We originally granted petitioners' motion for sanctions with respect to the IDR's and excluded respondent from soliciting any testimony related to them. We later reversed *430 our ruling following representations from respondent's District Counsel that respondent was not sure the file contained IDR's. Thereafter, respondent's District Counsel informed the Court that the file contained IDR's and apologized for not producing them for petitioners to copy. Petitioners argue that they needed the IDR's and appointment letters to effectively cross-examine Revenue Agent about documents he claimed to have requested from petitioners, but which were not delivered to him. Respondent argues that, although these IDR's were in the administrative file, she did not have to produce them to petitioners because these were retained copies of documents that respondent sent to petitioners during their audit. [25] Respondent also seeks asylum from this Court stating that her counsel was scurrying around, in a diligent manner, attempting to comply with our order issued 2 days before the hearing. *431 We reject respondent's arguments. Respondent should have produced the entire administrative file (except for the two privileged memoranda and supporting schedule) for petitioners to copy. We find nothing in Title VII of the Tax Court Rules of Practice and Procedure, and respondent has cited to us no authority, under which documents in the possession of respondent are excluded from discovery merely because copies of the documents may have been mailed to petitioners before a petition was filed with the Court. We previously crossed this bridge with respondent when we ordered her to produce, for petitioners to copy, all the documents in her administrative file other than documents for which we upheld her claimed privileges. Apparently, respondent did not appreciate our order; as stated by respondent's District Counsel at the hearing, Your Honor, "if you had ordered us to turn over the entire administrative file, we would have done it. But the order was turn over everything petitioners gave to the respondent. I think we are entitled to live with that order." In this sense, we agree with respondent; she is entitled to live with our order. Respondent was required to comply with *432 petitioners' discovery requests during the 21-day period from February 3 to February 24; the time to look through the administrative file (and produce the IDR's to petitioners) was then, not the day of (or 2 days before) the hearing. [26] *433 Respondent failed to present any authority during the hearing to support her aberrational proposition that she can withhold relevant documents from opposing counsel and did not follow the Court's suggestion to argue this issue on brief. Because respondent did not produce all the nonprivileged documents in the administrative file, as we ordered, we will grant petitioners' motion for sanctions with respect to the IDR's that were not produced to them and strike from the record any testimony of Revenue Agent elicited by respondent related to these documents. [27]
*434 With respect to the appointment letters, the record does not indicate that the administrative file contained appointment letters. Accordingly, we will deny petitioners' motion for sanctions with respect to these letters. Rule 72(a)(1) (party is required to produce documents within party's possession, custody, or control); Marsh v. Commissioner, 62 T.C. 256, 258 (1974) ("party cannot be required to produce a document that either does not exist * * * or no longer exists"). (Citations omitted.) 3. Whether Petitioners Exhausted the Administrative Remedies Available to Them Within the Service
During respondent's first meeting with petitioners' counsel, petitioners' counsel were notified that this was petitioners' final conference. Three months later, respondent issued her notice of deficiency to petitioners; respondent previously did not issue a preliminary notice of deficiency (i.e., a 30-day letter) because petitioners did not consent to extend the period of limitations. Respondent argued on brief that her failure to issue a 30-day letter to petitioners was due to petitioners' actions. In other words, respondent contended, petitioners made *435 a voluntary and deliberate decision to bypass Appeals before commencing litigation in this Court and this, in and of itself, precluded petitioners from recovering litigation or administrative costs under section 7430. We disagree. Based on the ultimate settlement of petitioners' case by Appeals, it strongly appears that the case could, and should, have been settled at the prepetition level. However, section 7430 does not precondition the awarding of litigation and administrative costs on petitioners' agreement to an extension of the period of limitations at the behest of respondent. Minahan v. Commissioner, 88 T.C. 492, 508 (1987); [28] see also Moran v. Commissioner, 88 T.C. 738, 742 (1987). Respondent generally has 3 years in which to examine a taxpayer's return and make an assessment. Sec. 6501(a). In lieu of extending this statutory period of limitations, taxpayers may invoke the jurisdiction of this Court, which petitioners chose to do. Moran v. Commissioner, supra at 742. *436 In support of her argument and contention, respondent cited section 301.7430-1, Proposed Proced. & Admin. Regs., 57 Fed. Reg. 19828 (May 8, 1992). Respondent proposed these regulations after this Court invalidated paragraphs (b)(1)(i)(B) and (f)(2)(i) of section 301.7430-1, Proced. & Admin. Regs., to the extent the paragraphs provided that a taxpayer did not exhaust administrative remedies within the Service if the taxpayer did not agree to extend the period of limitations. [29]Minahan v. Commissioner, supra at 508. Respondent is mistaken in her reliance on these proposed regulations; proposed regulations are not entitled to judicial deference. [30]Natomas North America, Inc. v. Commissioner, 90 T.C. 710, 718 n.11 (1988); *437 North Ridge Country Club v. Commissioner, 89 T.C. 563, 579-580 (1987), revd. on other grounds 877 F.2d 750 (9th Cir. 1989). They "carry no more weight than a position advanced on brief by the respondent." F.W. Woolworth Co. v. Commissioner, 54 T.C. 1233, 1265-1266 (1970); see also Scott v. Commissioner84 T.C. 683, 690 (1985). Petitioners exhausted the administrative remedies available to them within the Service. Respondent did not issue a 30-day letter to petitioners prior to issuing them her notice of deficiency on February *438 14, 1990, and petitioners' failure to receive a 30-day letter was not due to their actions. [31] Petitioners (with Accountant or counsel) had numerous meetings with respondent's agents before the notice of deficiency was issued to them. During the first meeting, Revenue Agent asked Han and Accountant questions; Han and/or Accountant answered and were responsive to Revenue Agent's questions. Revenue Agent requested from Han documents related to petitioners and Clocks; Han promptly supplied all these documents. Han did not refuse to give Revenue Agent any documents which he requested. During the second meeting, Revenue Agent and Assistant Revenue Agent asked Han additional questions; Han answered these questions. It was not until Supervising Agent arrived that the orderly conduct of the second meeting (and, as it appears from the record, all additional meetings) was disrupted, *439 causing Revenue Agent and Assistant Revenue Agent to stop asking questions, accumulating information, and properly conducting the audits of petitioners and Clocks. Respondent's actions, and not those of petitioners, prevented the further accumulation of information on this day and disrupted the orderly process of the audits. When Supervising Agent visited Accountant's office about 1 week later, Supervising Agent could have requested any additional information needed from Accountant, if respondent thought it necessary. Instead of diligently pursuing the audits, Supervising Agent resorted to pressure tactics aimed at quickly closing the cases (e.g., threat of immediate jeopardy assessment). Respondent's actions, and not the actions of petitioners, again prevented the efficient processing of the audits of petitioners and Clocks. When petitioners' recently retained counsel (O'Brien and Oates) initially met with respondent's agents, the agents did not want to discuss petitioners' case or otherwise resolve the case on terms other than their own. Petitioners' counsel were initially informed that their first conference with respondent's agents was petitioners' last. The agents allowed *440 petitioners only 7 days to respond to their proposals and refused to extend this period to allow petitioners' counsel to familiarize themselves with the facts of the case. This refusal was unreasonable, considering that neither petitioners nor their counsel had received (or seen) the RAR's for petitioners and Clocks. The 3 weeks requested by petitioners' counsel also approximated the time spent by Appeals Officer to resolve the cases after they were transferred to Appeals. [32]
*441 Contrary to respondent's contention on brief, nothing in the record shows that petitioners' failure to receive a 30-day letter prior to their receipt of respondent's notice of deficiency was "clearly due" to petitioners' actions. The record shows that the failure was due to the inexperience of Revenue Agent, his inability to develop fully the cases (factually and legally) within the 3-year statutory period under section 6501(a), his desire to close the cases quickly to meet his deadline, and the unprofessional and abusive manner of Supervising Agent. Petitioners were also told explicitly that they must consent to extend the period of limitations if they wanted to go to Appeals prior to the issuance of a notice of deficiency. As Revenue Agent summarized best: "There was a time constraint; unfortunately the case was getting old. We couldn't complete the examination to the full extent; there wasn't any cooperation on the part of the taxpayer to extend the statutes." We have previously held that a taxpayer's failure to cooperate with respondent, without adequate explanation, by extending a period of limitations does not mean that the taxpayer did not exhaust administrative remedies within the Service for purposes *442 of section 7430. Minahan v. Commissioner, 88 T.C. 492, 508 (1987). We hold likewise today; petitioners exhausted the administrative remedies available to them within the Service.[33]
*443 4. Whether Respondent's Position Was Substantially Justified
Petitioners must prove that respondent's positions in the administrative proceeding and the proceeding in this Court were not substantially justified. Sec. 7430(c)(4)(A)(i), (c)(7)(A) and (B); Huffman v. Commissioner, 978 F.2d 1139, 1143-1147 (9th Cir. 1992), affg. in part, revg. in part on other grounds, and remanding T.C. Memo. 1991-144; Stieha v. Commissioner, 89 T.C. 784, 790 n.5 (1987). This "not substantially justified" standard under section 7430 is applied as of the separate dates respondent took positions in the administrative proceeding and the proceeding in this Court. Sec. 7430(c)(7)(A) and (B); Huffman v. Commissioner, supra at 1143-1147; see also Caparaso v. Commissioner, T.C. Memo. 1993-255. [34] For purposes of the administrative proceeding, respondent took a position on February 14, 1990, the date of the notice of deficiency. Sec. 7430(c)(7)(B). For purposes of the proceeding in this Court, respondent took a position on June 22, 1990, the date *444 she filed her answer, and solidified her position on November 5, 1990, the date she filed her amended answer. [35]Huffman v. Commissioner, supra at 1148. *445 Respondent argued on brief that petitioners may only recover administrative costs prior to the time that the petition was filed because, assuming her position in the notice of deficiency was not substantially justified, her position after litigation commenced was substantially justified. In this regard, respondent contended, she reasonably could not have been expected to concede the case on answer and Appeals settled petitioners' case on a "timely and fair basis" after the case was docketed. Respondent cited Huffman as support for her argument. We disagree with respondent's argument. At the outset, we note that respondent took about 26 months following the petition to file a stipulation of settlement in this case. Because respondent resolved the case for the amount of taxes that petitioners actually owed, i.e, nothing, it is difficult for this Court to agree with respondent's assertion that the case was "settled" on a "timely and fair basis". We also disagree with respondent's argument with respect to Huffman. In Huffman v. Commissioner, T.C. Memo. 1991-144, affd. in part, revd. in part on other grounds, and remanded 978 F.2d 1139 (9th Cir. 1992), *446 the Service unreasonably handled the administrative disposition of the taxpayers' notice of deficiency after the notice was issued in violation of the TEFRA partnership audit rules. Following an administrative hearing, the taxpayers' petition in this Court, and respondent's concession in her answer, the taxpayers filed a motion for litigation and administrative costs under section 7430. With respect to the motion, the Court: (1) Awarded the taxpayers reasonable administrative costs under section 7430(a)(1), holding that respondent was not substantially justified in the administrative proceeding, (2) did not award litigation costs under section 7430(a)(2), holding that respondent was substantially justified in fully conceding the case in her answer, and (3) awarded a percentage of the costs allocated to the attorney fees and costs motion. In reversing and remanding our partial award of fees incurred in connection with the taxpayers' motion under section 7430, the Court of Appeals for the Ninth Circuit stated: The Congressional intent behind section 7430 is not served by looking only to the answer to determine whether the government's position in the judicial proceeding was "substantially *447 justified." The better approach is to examine the parties' conduct within each stage of the case. Here, most of [the taxpayers'] attorney's fees arose from the dispute over entitlement to and the amount of recoverable attorney's fees and costs. This kind of satellite litigation is generally referred to as "fees for fees litigation." [Citation omitted.] * * * Certainly the Commissioner may be justified in disputing a claim for excessive fees in some situations. Here, however, the Commissioner refused in both proceedings to acknowledge that [the taxpayers'] attorney incurred costs to prove that the Commissioner was unjustified in refusing to acknowledge that any fees should be awarded. So long as the government's position justifies recovery of fees, any reasonable fees to recover such fees are recoverable.
Huffman v. Commissioner, 978 F.2d 1139, 1148-1149 (9th Cir. 1992), affg. in part, revg. in part on other grounds, and remanding T.C. Memo. 1991-144. Contrary to respondent's belief, the court in Huffman did not hold that respondent's position in judicial proceedings generally is not firmly established by her *448 position in her answer. Rather, the court recognized the viability of "fees for fees" litigation, id. at 1148, and the ability to recover fees incurred to collect litigation and administrative fees under section 7430, notwithstanding a change in respondent's position from not substantially justified in an administrative proceeding, to substantially justified in a judicial proceeding. See also INS v. Jean, 496 U.S. 154, 162-166 (1990) ("substantial justification" finding not required before EAJA fees are awarded in "fees for fees" litigation).[36]
*449 With respect to respondent's justification for her position in the proceedings, respondent argued on brief that the issues underlying petitioners' notice of deficiency generally are "highly complex tax adjustments" relating to amounts that flow-through from an S corporation; thus, her position taken in the notice of deficiency, answer, and amended answer was substantially justified under the facts of this case. Once again, we disagree. Under the original version of section 7430, enacted as part of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 292(a), 96 Stat. 324, 572-574, a taxpayer had to prove that respondent's position was "unreasonable". The word "unreasonable" was changed to "not substantially justified" effective with petitions filed in this Court after December 31, 1985. Sec. 1551 of the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, 100 Stat. 2085, 2572. This Court has held that the current standard for determining "not substantially justified" is the same as the prior standard for determining "unreasonable". Powers v. Commissioner, 100 T.C.    ,     (1993); Sokol v. Commissioner, 92 T.C. 760, 763 n.7 (1989); *450 Sher v. Commissioner, 89 T.C. 79, 84 (1987), affd. 861 F.2d 131 (5th Cir. 1988). Whether respondent's position in the instant case was or was not substantially justified depends on the facts and circumstances of the case, as well as any legal precedents which may relate thereto. Coastal Petroleum Refiners, Inc. v. Commissioner, 94 T.C. 685, 688-696 (1990); Sher v. Commissioner, supra at 84-87. For petitioners to prevail, the facts and circumstances must show that respondent's position did not have a reasonable basis as a matter of fact or a matter of law. Pierce v. Underwood, 487 U.S. 552, 564-565 (1988). In other words, petitioners must prove that respondent's position, as a matter of fact or a matter of law, was not "justified to a degree that could satisfy a reasonable person." Id. at 565. According to the legislative history under the TRA: The committee intends that the determination by the court on this issue is to be made on the basis of the facts and legal precedents relating *451 to the case as revealed in the record. Other factors the committee believes might be taken into account in making this determination include, (1) whether the government used the costs and expenses of litigation against its position to extract concessions from the taxpayer that were not justified under the circumstances of the case, (2) whether the government pursued the litigation against the taxpayer for purposes of harassment or embarrassment, or out of political motivation, and (3) such other factors as the court finds relevant.
* * * H. Rept. 97-404, at 12 (1981). Based on the facts and circumstances in the instant case, respondent's position was not substantially justified; it was not reasonable in fact or in law. Respondent assigned the examinations of the 1986, 1987, and 1988 Federal income tax returns of Clocks and petitioners to one of her rookie agents, Revenue Agent. The cases were assigned as training cases in or about February 1989. Before this assignment, Revenue Agent completed no examinations of S corporations and no examinations of alleged fraud; of the 30 examinations completed by Revenue Agent, none were "unagreed cases". Despite his inexperience, and *452 the so-called complexity of the issues, respondent gave Revenue Agent the primary responsibility to develop the facts and law of the cases. The result: Revenue Agent's RAR for petitioners, which incorporated his RAR for Clocks and which was the basis of the notice of deficiency later issued to petitioners, alleged an amount due from petitioners equal to $ 587,768 (not including the time-sensitive fraud provision under section 6653(b)(1)(B)). When the cases were ultimately settled by Appeals Officer, respondent fully conceded all major adjustments contained in Revenue Agent's RAR's. [37] Although such concessions, in and of themselves, do not mean that respondent's position was not substantially justified within the meaning of section 7430(c)(4)(A)(i), Sokol v. Commissioner, 92 T.C. 760, 767 (1989), respondent's concessions remain a relevant factor to consider in determining the degree of her justification, Heasley v. Commissioner, 967 F.2d 116, 120 (5th Cir. 1992), affg. in part and revg. in part T.C. Memo. 1991-189; Estate of Perry v. Commissioner, 931 F.2d 1044, 1046 (5th Cir. 1991); *453 Powers v. Commissioner, supra at    . Respondent's concessions suggest that Revenue Agent did not understand the facts of petitioners' case or the law applying thereto. Revenue Agent was assigned the cases of petitioners and Clocks in or about February 1989 and prepared his RAR's on December 28, 1989. Although Revenue Agent had approximately 1 year to prepare these RAR's, Revenue Agent failed to develop the facts of the cases and failed to develop the applicable law. Among other things, Revenue Agent did not review all the documents and other analysis given to him by Han and failed to research relevant statutory provisions. Nevertheless, based on an incomplete set of facts and law, Revenue Agent prepared his RAR's for petitioners and Clocks and included numerous *454 unsupported adjustments. With respect to Revenue Agent's alleged income from cancellation of indebtedness, Revenue Agent built a weak and porous foundation. Revenue Agent asserted that Daijin, Dong Bang, and Chang Soo forgave debt owed to them by Clocks; to support these bald assertions, Revenue Agent stated in his RAR: "Examination of the outstanding liabilities clearly shows that there was no legal action or request for credit collection by the creditors". (Emphasis added.) This "clear showing", according to Revenue Agent, was his reliance on statements from Han that he was not going to repay the debts. Han was not the creditor; Han was the debtor. Forgiveness of debt generally means that the creditor forgave the debt, not the debtor. Revenue Agent never contacted the creditors (Daijin, Dong Bang, and Chang Soo) to inquire about the status of their receivables from Clocks or, more importantly, whether they forgave any debts owed to them by Clocks. With respect to the cost of goods sold adjustments, Revenue Agent knew that: (1) Clocks purchased defective clocks from Daijin and Dong Bang, (2) Clocks sold these clocks to its major customers, and (3) although Clocks issued *455 credits to its customers, neither Daijin nor Dong Bang gave Clocks any immediate credits or refunds. Revenue Agent also knew that: (1) Clocks' creditors aggressively pursued their receivables from Clocks, including threatening to foreclose on the collateralized property of Chang Soo, (2) Chang Soo borrowed about $ 200,000 to pay some of the collateralized debt, (3) Chang Soo was telephoning Han night and day asking for repayment of amounts owed to him by Clocks, and (4) petitioners mortgaged their home to raise funds to pay Clocks' debts. As stated by Appeals Officer, who reviewed Revenue Agent's administrative file, "I could see no basis for * * * [Revenue Agent] concluding that there was a forgiveness of indebtedness." Neither can we; in both fact and law, respondent's position with respect to the alleged forgiveness of income was not substantially justified. Revenue Agent also made adjustments to Clocks' cost of goods sold because the all events test under section 461 was not met with respect to the purchases of clocks from Daijin and Dong Bang. [38] In this regard, Revenue Agent asserted that the liabilities were not "fixed", for purposes of the all events test, and primarily *456 denied the deductions under section 1.461-1(a)(2), Income Tax Regs., and Mooney Aircraft, Inc. v. United States, 420 F.2d 400 (5th Cir. 1969). The facts of the case, and the law applicable to these facts, do not support Revenue Agent's assertions or determinations with respect to the cost of goods sold. Under the accrual method of accounting, a deduction generally is allowed for Federal income tax purposes for the taxable year in which: (1) All the events have occurred establishing the fact of the liability (i.e., the liability is fixed), and the amounts of the liability can be determined with reasonable accuracy (i.e., the liability is determinable), and (2) economic performance has occurred with respect to the liability. Sec. 1.461-1(a)(2), Income *457 Tax Regs.; see also sec. 461(h). Clocks' liability for its purchases of clocks from Daijin and Dong Bang was fixed and determinable, and economic performance occurred at the time the clocks were shipped to Clocks. [39] Revenue Agent had invoices to Clocks from Daijin and Dong Bang, and contracts entered into with respect to the invoices. These invoices showed the number of clocks shipped to Clocks and a sum certain for the purchase price. Revenue Agent had no evidence showing that Daijin and Dong Bang did not ship goods to Clocks pursuant to these contracts and invoices and never attempted to determine whether or not the goods were shipped (or that the goods were never shipped). As stated by Appeals Officer, "I do not believe [Revenue Agent] applied [section 461] correctly in this situation". Once again, neither do we; in both fact and law, respondent's position with respect to the cost of goods sold was not substantially justified. *458 With respect to Revenue Agent's adjustment to petitioners' income for unreported capital gains, Revenue Agent considered certain distributions from Clocks to Han taxable because the distributions were in excess of Han's basis in Clocks. [40] To arrive at this determination, Revenue Agent assigned to Han a zero basis in the stock of Clocks for the 1986 and 1987 taxable years. His justification for these bases was minimal, his audit papers were incomplete, and his calculations were incorrect. Although a basis analysis should be performed during the audit of a flow-through entity, such as Clocks, Revenue Agent neglected to perform a basis analysis on Clocks. It is impossible to determine correctly whether distributions from an S corporation, such as Clocks, gave rise to income to a shareholder, such as Han, without determining the shareholder's adjusted basis in the stock of the corporation. Sec. 1368(a) and (b). Revenue Agent had, or easily could have obtained, all the information necessary to determine Han's basis in the stock of Clocks. However, Revenue Agent neglected to do so. Revenue Agent's position, once again, was not substantially justified in fact or in law. *459 Finally, Revenue Agent charged that petitioners were liable for fraud. Based on his review of the facts of petitioners' case, Revenue Agent stated, Han "was not an honest taxpayer". Revenue Agent had no documentary evidence suggesting fraud by petitioners and, as concluded by Appeals Officer, it was unreasonable, both as a matter of fact and law, to assert fraud in this case. We agree with Appeals Officer; Revenue Agent's position with respect to fraud was not substantially justified in fact or in law. Respondent bears the burden of proving by clear and convincing evidence that a taxpayer is liable for an addition to tax for fraud. Sec. 7454(a); Rule 142(b). In order to sustain her burden, respondent must prove, inter alia, that the taxpayer intended to evade a tax known or believed to be owing. Stoltzfus v. United States, 398 F.2d. 1002, 1004 (3d Cir. 1968); see generally Merlino v. Commissioner, T.C. Memo. 1993-200 (list of "badges of fraud" to be considered in making a fraud determination). The facts of the case do not suggest that Han intended to evade a tax known or believed to be owing. Han carefully kept *460 his personal records separate from his business records and his personal expenses separate from his business expenses. Han also hired Accountant, a certified public accountant, to oversee the bookkeeping of Clocks. Accountant, in turn, established a record-keeping system for Clocks, reviewed Clocks' accounting records monthly, and prepared the tax returns for Clocks and petitioners. 5. Whether the Litigation and Administrative Costs Requested in Petitioners' Motion and Supplemental Motion are Reasonable
Respondent conceded that the $ 11,698.12 amount requested by petitioners in their Motion was reasonable, but argued that the $ 39,454.48 of litigation costs requested in the Supplemental Motion were excessive. Respondent stated that the excessive costs should be reduced by 50 percent. [41]
*461 Reasonable litigation costs include attorney fees paid or incurred in connection with a court proceeding. Sec. 7430(c)(1); Powers v. Commissioner, 100 T.C.    ,     (1993). We find that the 242.4 hours spent by petitioners' counsel in connection with this hearing were reasonable under the facts and circumstances of this case. In this regard, 241.3 hours of this time were attributed to petitioners' attorneys who were present at the hearing and the hours spent by these attorneys were reflected clearly by their performance at the hearing; petitioners' counsel unquestionably prepared themselves to win. With respect to the claimed fees for law clerks and paralegals, this Court has previously awarded these fees to prevailing taxpayers, Powers v. Commissioner, supra at    , and do likewise today. We find 42.6 hours to be reasonable under the facts and circumstances of this case. Although respondent has not objected specifically to the rate assigned to these persons, we exercise our discretion and reduce petitioners' requested rates of $ 50 for the law clerks and $ 85 for the paralegals to a flat rate of $ 30 for each. [42]Id. at    . Accordingly, we *462 reduce petitioners' requested award by $ 1,692. We also find 5 hours for accounting services to be reasonable. Respondent did not object specifically to the $ 250 an hour rate requested for the accountant. We exercise our discretion, however, and reduce this rate to $ 75 an hour; this is the accountant's rate in the Motion. [43] Accordingly, we reduce petitioners' requested award by another $ 875. *463 With respect to the miscellaneous costs of $ 5,758.87, the itemized schedules allocated these amounts to photocopying ($ 2,340.80), local transportation ($ 198.50), postage and messenger service ($ 112.97), telephone ($ 37.68), outside information ($ 193.41), staff overtime ($ 1,174.25), business meals ($ 50.10), LEXIS and WESTLAW computer research ($ 593.16), binder ($ 3), parking ($ 13), and "miscellaneous" ($ 1,042). We award petitioners $ 3,542.62. Petitioners have not established their entitlement to the $ 1,042 amount labeled as "miscellaneous". We also treat the $ 1,174.25 of overtime as overhead that is included in our previously allowed rates and not payable separately. Id. at    ; see also Hirschey v. FERC, 777 F.2d 1, 6 (D.C. Cir. 1985). Accordingly, we further reduce petitioners' requested award by $ 2,216.25. To summarize, we award petitioners administrative costs of $ 1,997.04 and litigation costs of $ 44,372.31. [44]
*464 We have considered all other arguments made by respondent and find them to be without merit. An appropriate order and decision will be entered. Footnotes
1. Amount is 50 percent of the interest on the portion of the underpayment attributable to fraud.↩
1. Respondent filed her answer on Jun. 27, 1990, generally denying all material allegations of error contained in the petition. Respondent's position taken in her answer was the same as that taken in her notice of deficiency. Respondent slightly changed her position in her amended answer which was filed on Nov. 5, 1990. Respondent conceded in her amended answer that she erred in alleging that Kathy K. Han (Mrs. Han) was liable for the additions to tax for fraud under sec. 6653(b) for the years at issue. In all other regards, respondent's position in her amended answer was the same as that taken in her notice of deficiency and answer.↩
2. American Express initially placed 300 orders for the clocks and informed Vince S. Han (Han) that it might buy as many as 5,000 to 10,000 clocks from Clocks, Ltd. (Clocks). American Express ultimately bought approximately 7,000 to 8,000 clocks.↩
3. Han and Mrs. Han filed a Form 1040, U.S. Individual Income Tax Return, for each year at issue using the status of "Married filing joint return".↩
4. The period of limitations on Clocks' 1986 Federal income tax return expired on March 15, 1990, and the period of limitations on petitioners' 1986 Federal income tax return expired on April 16, 1990.↩
5. Among other things, petitioners' counsel wanted to be in a better position to respond adequately to respondent's request to extend the period of limitations.↩
6. In Han's capacity as sole shareholder of Clocks, all adjustments to Clocks "flowed through" to him. See sec. 1366.↩
7. Respondent's notice of deficiency was mailed to petitioners on Feb. 14, 1990, and was based on all the adjustments in the revenue agent reports (RAR's) prepared by the assigned revenue agent (Revenue Agent). Revenue Agent's RAR's were not enclosed with this notice. Prior to issuing her notice of deficiency, respondent did not issue petitioners a preliminary notice of deficiency (i.e., a 30-day letter).↩
8. Robert Dedera (Appeals Officer) was assigned the cases of petitioners and Clocks on Jan. 30, 1991. Appeals Officer initially reviewed petitioners' protest, Revenue Agent's RAR's, and Revenue Agent's audit papers to ascertain the manner in which Revenue Agent developed his adjustments. Following his review, Appeals Officer's overall impression with the cases was that Revenue Agent's preparation was incomplete and "very troubled". Appeals Officer eventually resolved all issues in the cases in 132 hours.↩
9. Appeals Officer testified that these arguments are inherently contradictory; either one, but not both, may apply, and there is no reasonable basis in law or fact for applying both positions at the same time.↩
10. Accordingly, Revenue Agent treated as capital gains to Han: (1) The entire amount of distributions he determined in the 1986 and 1987 taxable years, and (2) the entire amount of distributions he determined in the 1988 taxable year, less Han's basis of $ 20,367. See sec. 1368(a) and (b).↩
11. Revenue Agent's alleged badges of fraud included: (1) Understatement of petitioners' income, (2) petitioners' personal expenditures deducted as business expenses on Clocks' Federal income tax returns, (3) substantial increase in petitioners' net worth in years that petitioners reported total losses, rather than total income, on their Federal income tax returns, and (4) claiming improper deductions. Revenue Agent applied the additions to tax for fraud to all his adjustments in petitioners' RAR, except the increased itemized deductions.↩
12. In relevant part, 5 Administration, Internal Revenue Manual (CCH), sec. 8232.1 at 25,557 provided: (1) District directors should not transmit a case to Appeals with less than 120 days remaining before the expiration of the statutory period for assessment * * *. (2) If a case is received in Appeals with less than 120 * * * days remaining before the period of limitations expires, the chief will decide whether to accept it or return it.↩
13. As assistant chief, Robert Neurater (Assistant Chief) was the number two person in the Office of Appeals (Appeals) in Chicago and was responsible for its daily operations. Chicago Appeals had six groups of appeals officers attempting to resolve tax disputes, each group supervised by a manager reporting directly to Assistant Chief.↩
14. In other words, the taxpayer would first have to extend the period of limitations in order to receive a transfer to Appeals.↩
15. Appeals Officer and Mark A. Oates (Oates) agreed that Han's unreported income for 1987 was $ 47,000, instead of the $ 50,480 amount alleged by Revenue Agent. Petitioners subsequently conceded all other minor adjustments for 1987 and 1988 contained in Revenue Agent's RAR's for them (i.e., travel and entertainment expenses of $ 2,442 and $ 935, insurance expense of $ 1,032, interest expense of $ 1,305, and forgiveness of indebtedness income of $ 12,139). Taking into account the unreported income and other minor adjustments, petitioners had no tax liability for 1987 or 1988.↩
1. This dollar amount was $ 75, increased by monthly cost of living adjustment (COLA) calculated from January 1, 1986.↩
16. The Court has held that the cost of living adjustment (COLA) under sec. 7430 is calculated from Oct. 1, 1981, the date of enactment of a similar provision authorizing attorney fees contained in the Equal Access to Justice Act (EAJA), Pub. L. 96-481, sec. 204(a), 94 Stat. 2321, 2327-2329 (1980). Bayer v. Commissioner, 98 T.C. 19, 23 (1992); Cassuto v. Commissioner, 93 T.C. 256, 272-274 (1989), affd. in part and revd. in part 936 F.2d 736 (2d Cir. 1991). The Courts of Appeals for the Second, Fifth, and Ninth Circuits have held otherwise; these courts calculate the COLA from Jan. 1, 1986, the date on which sec. 7430 was amended to allow for a COLA. Huffman v. Commissioner, 978 F.2d 1139, 1151 (9th Cir. 1992), affg. in part, revg. in part, and remanding T.C. Memo. 1991-144; Heasley v. Commissioner, 967 F.2d 116, 125 (5th Cir. 1992), affg. in part and revg. in part T.C. Memo. 1991-189; Cassuto v. Commissioner, 936 F.2d 736, 742-743 (2d Cir. 1991), affg. in part and revg. in part 93 T.C. 256↩ (1989). Although the Court of Appeals for the Seventh Circuit, the circuit to which this case is appealable, has not addressed this question, petitioners sought a COLA calculated from Jan. 1, 1986. Because respondent did not object to petitioners' calculation of the COLA from this more recent date, we do not address this issue in this case.
17. In relevant part, respondent's motion stated that: (1) The 2-day extension will allow respondent to more fully comply with petitioners' interrogatories and requests, and (2) "respondent is confident↩ that the interests of both parties will be served, as well as the interests of the Court, since [the extension] will lead to a narrowing of the issues". (Emphasis added.)
18. Petitioners generally alleged that respondent was not responsive to their interrogatories and requests for admission and production of documents. With respect to petitioners' request for production of documents, respondent raised numerous objections to petitioners' request to produce the entire administrative file or files in the cases.↩
19. With respect to the memoranda (and supporting statement), we upheld various privileges claimed by respondent. During the hearing, respondent voluntarily gave petitioners the appeals transmittal memorandum and supporting statement.↩
20. We note that the parties stipulated that the documents submitted to the Court at the beginning of the hearing, none of which were information document requests (IDR's) or appointment letters, were the entire administrative file held by respondent. We also note that petitioners do not have the original (or a copy of) IDR's or appointment letters.↩
21. The provisions for awarding litigation fees contained in sec. 7430 were added to the Internal Revenue Code as part of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 292(a), 96 Stat. 324, 572-574. As originally enacted, these provisions applied to petitions filed in the Court after Feb. 28, 1983, and before Jan. 1, 1986. TEFRA sec. 292(a), (e). The Tax Reform Act of 1986 (TRA), Pub. L. 99-514, sec. 1551, 100 Stat. 2085, 2752-2753, reenacted these provisions generally for petitions filed in the Court after Dec. 31, 1985. This reenactment more closely conformed sec. 7430 to the EAJA. H. Rept. 99-841, at II-801, II-802 (1986), 1986-3 C.B. (Vol. 4) 801-802. The Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub. L. 100-647, sec. 6239(a), 102 Stat. 3342, 3743-3746, amended sec. 7430 to allow the recovery of costs incurred in administrative proceedings. See also H. Rept. 100-1104, at 224-226 (1988), 1988-3 C.B. 714-716. These amendments applied to administrative proceedings commenced after Nov. 10, 1988. TAMRA sec. 6239(d), 102 Stat. 3746. For administrative proceedings commenced before Nov. 11, 1988, administrative costs are not recoverable. Id.; H. Rept. 100-1104, at 224-226 (1988). As amended by TAMRA, sec. 7430 generally provided: Sec. 7430(a) In General. -- In any administrative or court proceeding which is brought by or against the United States in connection with the determination, collection, or refund of any tax, interest, or penalty under this title, the prevailing party may be awarded a judgment or a settlement for -- (1) reasonable administrative costs incurred in connection with such administrative proceeding within the Internal Revenue Service, and (2) reasonable litigation costs incurred in connection with such court proceeding.
(b) Limitations. -- (1) Requirement That Administrative Remedies Be Exhausted. -- A judgment for reasonable litigation costs shall not be awarded under subsection (a) in any court proceeding unless the court determines that the prevailing party has exhausted the administrative remedies available to such party within the Internal Revenue Service. * * * (4) Costs Denied Where Party Prevailing Protracts Proceedings. -- No award for reasonable litigation and administrative costs may be made under subsection (a) with respect to any portion of the administrative or court proceeding during which the prevailing party has unreasonably protracted such proceeding.
(c) Definitions. -- For purposes of this section -- * * * (4) Prevailing Party. -- (A) In General. -- The term "prevailing party" means any party in any proceeding to which subsection (a) applies * * * (i) which establishes that the position of the United States in the proceeding was not substantially justified,
* * * (7) Position Of United States. -- The term "position of the United States" means -- (A) the position taken by the United States in a judicial proceeding to which subsection (a) applies, and (B) the position taken in an administrative proceeding to which subsection (a) applies as of the earlier of -- (i) the date of the receipt by the taxpayer of the notice of the decision of the Internal Revenue Service Office of Appeals, or (ii) the date of the notice of deficiency.↩
22. For positions taken in the Court after Dec. 31, 1989, we may award attorney fees to a taxpayer if respondent's counsel unreasonably and vexatiously multiplied the proceedings in the Court. Sec. 6673(a)(2). Petitioners have not claimed that respondent's counsel unreasonably and vexatiously multiplied the proceedings in the Court, and we express no opinion on this issue.↩
23. This requirement only applies to a judgment for an award of reasonable litigation costs. Sec. 7430(b)(1).↩
24. Although requests for admission are not included as a permissible method of discovery under Title VII of the Tax Court Rules of Practice and Procedure, Title IX includes rules for requesting admissions. See Rule 90.↩
25. Petitioners do not have the original (or a copy of) IDR's or appointment letters that respondent may have sent to them during their audit.↩
26. Contrary to respondent's representations in her motion to extend the time to comply with petitioners' discovery requests, this Court's granting of the requested 2-day extension did not serve the interests of the parties or the Court; issues were not narrowed and respondent did not comply fully with petitioners' requests.↩
27. Respondent stipulated that the documents submitted to the Court at the beginning of the hearing, none of which were IDR's, were the entire administrative file held by respondent. Thus, our sanction merely forces respondent to live with her stipulation. We note, however, that respondent elicited little relevant testimony (if any) from Revenue Agent with respect to the IDR's. Moreover, we discredit much of Revenue Agent's testimony and view it very suspiciously; Revenue Agent's answers were evasive, argumentative, long-winded, and not responsive. In addition, Revenue Agent hesitated before answering most questions, seeming to be choosing his words with care. On separate occasions, this Court was forced to order Revenue Agent to answer questions and be more candid in his answers. Even respondent's counsel, on separate occasions, appeared critical of Revenue Agent for his manner on the stand, as well as not being responsive to respondent's questions. We also note that respondent could have called the other revenue agent participating in the examinations (Assistant Revenue Agent) and/or the agent that supervised the examinations (Supervising Agent) to attempt to corroborate Revenue Agent's testimony (or rebut Han's testimony), but chose not to do so. It is well established that the failure of one party to introduce evidence within his or her possession leads to the inference that the information if produced would be favorable to the opposing party. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947); see also McKay v. Commissioner, 89 T.C. 1063, 1069 (1987), affd. 886 F.2d 1237↩ (9th Cir. 1989) (failure of witness to testify to fact peculiarly within his knowledge suggests that testimony would have been unfavorable to him).
28. In Minahan v. Commissioner, 88 T.C. 492, 507-508↩ (1987), this Court held that, contrary to respondent's regulations, respondent could not require a taxpayer to extend the period of limitations in order to qualify for litigation fees under sec. 7430.
29. We also note that the predecessor regulation, sec. 301.7430-1, Proced. & Admin. Regs., limited its applicability to proceedings filed in this Court after Feb. 28, 1983, and before Jan. 1, 1986. Sec. 301.7430-1(h), Proced. & Admin. Regs.↩
30. For completeness, we note that sec. 301.7430-1, Proposed Proced. & Admin. Regs., 57 Fed. Reg. 19828 (May 8, 1992), would not otherwise have applied to the instant case because petitioners filed their petition on May 9, 1990, 2 years before the May 8, 1992, proposed effective date of sec. 301.7430-1, Proposed Proced. & Admin. Regs., supra↩.
31. For completeness, we note that petitioners also participated in respondent's appeals process while their case was in docketed status.↩
32. Respondent's conduct at this meeting typified the audits of petitioners and Clocks. Petitioners were fully cooperative during the audits, responding to questions of respondent's agents and making available to them all the documents in petitioners' possession. Revenue Agent and Supervising Agent, on the other hand, were not interested in amicably discussing the issues of the cases or efficiently processing the cases to determine the amount of tax (if any) due from petitioners. Instead, Supervising Agent and Revenue Agent tried to coerce petitioners into paying a substantial amount of taxes, for which they were not liable, through threats of incarceration, jeopardy assessments, and fraud penalties.↩
33. Respondent may have been precluded by her own guidelines from transferring the cases of petitioners and Clocks to Appeals without petitioners' consent to extend the period of limitations. According to Assistant Chief, a case is rarely, if ever, transferred to Appeals with fewer than 120 days remaining on a period of limitations. See also IRM sec. 8232.1. In the case at hand, respondent's RAR's were dated Dec. 28, 1989, and 120 days before the expiration of the period of limitations on petitioners' 1986 Federal income tax return was Dec. 17, 1989. Sec. 6501(a); see also Bufferd v. Commissioner, 506 U.S.    ↩, 113 S. Ct. 927, 933 (1993) (limitations period within which respondent must assess taxes on the income tax return of an S corporation shareholder runs from the date on which the shareholder's return is filed).
34. As mentioned above, TAMRA amended sec. 7430 to allow the recovery of costs incurred in administrative proceedings commenced after Nov. 10, 1988. In a case of first impression, this Court held that post-TAMRA language required a bifurcation of respondent's position between her position in the administrative proceeding and her position in the judicial proceeding. Huffman v. Commissioner, T.C. Memo. 1991-144, affd. in part, revd. in part on other grounds, and remanded 978 F.2d 1139 (9th Cir. 1992). On appeal, the Court of Appeals for the Ninth Circuit agreed with our bifurcation approach. Huffman v. Commissioner, 978 F.2d 1139, 1147 (9th Cir. 1992), affg. in part, revg. in part on other grounds, and remanding T.C. Memo. 1991-144↩.
35. As mentioned above, respondent's position in her amended answer generally was the same as her position in her answer and notice of deficiency.↩
36. Although not mentioned by respondent, we recognize that the Court of Appeals for the Seventh Circuit has held that respondent's position was substantially justified after she conceded a case in full following a general denial in her answer. Harrison v. Commissioner, 854 F.2d 263, 265 (7th Cir. 1988), affg. T.C. Memo. 1987-52. In Harrison↩, however, respondent's concession came 5 months after she filed her answer. In the instant case, by contrast, the stipulation of settlement was filed almost 20 months after respondent filed her amended answer and almost 24 months after she filed her answer.
37. As mentioned above, respondent did not concede the $ 47,000 in unreported income or other minor adjustments contained in the RAR's. All the same, these amounts did not generate deficiencies in petitioners' income tax for the years at issue.↩
38. This adjustment was in addition to Revenue Agent's theory that Clocks realized income from cancellation of accounts payable to Daijin and Dong Bang. The RAR's did not state that one adjustment was made as an alternative to the other.↩
39. Revenue Agent's reliance on Mooney Aircraft, Inc. v. United States, 420 F.2d 400 (5th Cir. 1969), is misplaced. In Mooney, the Court of Appeals for the Fifth Circuit upheld the Commissioner's disallowance of a current deduction under sec. 446(b) for an expense the actual payment of which could be made, if at all, 15, 20, or 30 years after the year for which the deduction was claimed. Id.↩ at 409-410.
40. Distributions from Clocks to Han would be includable in his gross income to the extent the amount of the distribution exceeded Han's adjusted basis in the stock of Clocks. This excess would be treated as a capital gain. Sec. 1368(a) and (b); see also secs. 1221 and 1222.↩
41. Respondent provided no explanation for her 50-percent reduction; it would appear that respondent merely grabbed an arbitrary percentage from thin air. All the same, we agree that some of the costs were excessive and, as discussed below, reduce the excessive costs accordingly.↩
42. For services between May 9, 1990, to Jun. 26, 1992, petitioners requested a flat rate of $ 30 for paralegals and law clerks. For services between Feb. 1993 and Jun. 1993, the requested rates increased to $ 50 for the law clerks and $ 85 for the paralegals. Nothing in the Supplemental Motion supports applying different rates to paralegals and law clerks, or the requested increase in the rates for law clerks and paralegals.↩
43. Petitioners documented the $ 250 an hour rate in the Supplemental Motion with a letter from the accountant. The accountant who provided the $ 75 an hour services mentioned in the Motion is the same accountant who provided the $ 250 an hour services mentioned in the Supplemental Motion. Petitioners have provided no support for the increased rate.↩
44. The award of $ 44,372.31 consists of the $ 9,701.08 of litigation costs requested in the Motion and $ 34,671.23 of the litigation costs requested in the Supplemental Motion. The award of litigation costs with respect to the Supplemental Motion consists of $ 29,475.61 for attorney fees, $ 558 for law clerks, $ 720 for paralegals, $ 375 for accountants, and $ 3,542.62 for miscellaneous costs.↩